[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
Memorandum of Decision
This is an appeal from the decision of the Windsor Locks Zoning Board of Appeals (hereinafter, the "Board") granting a permit to the intervening defendant, Roncari Development Company (hereinafter, "Roncari"), for the construction of a valet parking facility on a thirty-two acre tract located on the south side of Schoenphoester Road, several hundred feet west of its intersection with route 75 (Ella Grasso Turnpike).
In the amended complaint (10/10/89), the named plaintiffs are: Airport Valet Parking Inc.; Bradley Air Parking, Inc.; VIP Valet Parking; and, Piccolo's Valet Parking, Inc. Roncari was named in the citation for this action and, on or about October 31, 1989, moved for party status; by order of the court entered on December 12, 1989. Roncari was granted permission to be made a party defendant. On January 11, 1991, Airport Valet Parking withdrew from the appeal.
The amended complaint makes reference to a "moratorium" on valet parking facilities, more specifically, at certain relevant times, the Windsor Locks Planning and Zoning Commission adopted regulations which prohibited valet parking services in all zones including industrial zones; the Roncari property is located in an industrial zone. This is not an appeal from any action of the Windsor Locks Planning and Zoning Commission. As stated, plaintiffs, operators of valet CT Page 727 parking businesses on Route 75, are challenging the decision of the Board allowing Roncari to construct and operate a valet parking business on Schoenphoester Road; basically, plaintiffs attack the Board's decision on the grounds it was inconsistent with the town's zoning regulations (moratorium), discriminated against other valet parking operators, and adversely affected their interests. Alternatively, plaintiffs have challenged the sufficiency of the public notice of the Board's hearing on Roncari's application for a permit. Defendant's have moved to dismiss the appeal for lack of aggrievement; they have also moved to dismiss the appeal for lack of subject matter jurisdiction on the basis that the named plaintiffs are not legal entities capable of bringing suit. The court, by agreement of the parties, reserved decision on the motions to dismiss, and proceeded with the trial of the appeal (legal arguments presented on the merits).
I. Factual Background
On or about September 6, 1985, Roncari filed its initial application with the Board; it recited the following: "[a]s a result of a denial by . . . [the] Building Inspector on September 4, 1985 to allow [Roncari] to obtain a Building Permit to construct a surface parking facility. . ." The application requested a public hearing and certification for motor vehicle public storage on the Schoenphoester Road property. The record discloses that while the application was pending before the Board, the Planning and Zoning Commission, on or about September 9, 1985, adopted regulations (so called "moratorium") which expressly prohibited "valet parking services" in all zones, including industrial zones. The Board apparently did not act on Roncari's application for a permit and certification, and Roncari brought two appeals to the Superior Court which were consolidated and heard by Judge Barall: CV 85-0310116, from the action of the Planning and Zoning Commission in enacting the September 9, 1985 regulations; and, CV 85-0311719, regarding the September 6, 1985 application to the Board for a permit and certification. In the proceedings before Judge Barall, it was agreed by the parties that if Roncari's appeal of the Planning and Zoning Commission [was] sustained, then judgment would enter in favor of Roncari and the relief Roncari requested in paragraph 2 of its prayer for relief against the Zoning Board of Appeals should be granted. In the consolidated appeals, it was further stipulated that the regulations adopted by the Planning and Zoning Commission on September 9, 1985 CT Page 728 affected industrial zoned property within 500 feet of town's boundary and that the Commission had not given notice of its proposal to expressly prohibit valet parking in such zones to the regional planning agency prior to its public hearing.
After finding that Roncari was an aggrieved party, that the Planning and Zoning Commission had not given notice to the regional planning agency in accordance with General Statutes Section 8-3b, and that failure to provide such notice constituted a jurisdictional defect requiring reversal, Judge Barall sustained both appeals (CV 85-0310116, and CV 85-0311719); pursuant to the agreement of the parties, "the defendant Zoning Board [was] ordered to decide the plaintiff's [Roncari's] request for certification and appeal of the denial of the building inspector in accordance with Section 4.5.4 of Town Zoning Ordinance as it existed on September 4, 1985."
On or about June 14, 1989, Roncari filed with the Board its second application which is the subject matter of the instant appeal; it requested "a hearing by [the Board] in accordance with the ruling of the Superior Court for the Judicial District of Hartford/New Britain dated May 3, 1989 [Judge Barall] . . . on my application dated September 6, 1985 . . ." A hearing on the 1989 application was scheduled for July 10, 1989; the public notice read:
 Application No. 89-90-01 the request of Roncari Development Company, South Main Street, East Granby, by agent Attorney Kevin McCann, City Place, Hartford, for permission to construct a surface parking facility on a 32-acre parcel of land on the south side of Schoenphoester Road approximately 500 feet west of its intersection with Ella Grasso Turnpike, in accordance with the ruling of the Superior Court for the Judicial District of Hartford/New Britain dated May 3, 1989 on this application dated September 6, 1985, which was previously withdrawn without prejudice. This appeal is based on Section XIV, Paragraph 14.31 of the Windsor Locks Zoning Regulations and Section 8-6 of the Connecticut General Statutes.
Among those present at the July 10, 1989 public hearing were Attorney McCann and Mr. Joseph Calsetta, CT Page 729 both on behalf of Roncari, and Attorney Elliot Gersten, who represents the plaintiffs in this appeal (also present were certain of the principals in plaintiff businesses). At the outset of the hearing, there was some discussion between Attorney McCann and the Board's chairman regarding whether the 1985 application had been denied or withdrawn, the latter maintaining that it had been withdrawn without prejudice by Mr. Calsetta on the Chairman's recommendation because the Board was not sure whether or not it could act on that (1985) application. Counsel for Roncari contended that regardless of whether the 1985 application had been withdrawn or denied, a hearing thereon had not been held, and that the present application, filed following Judge Barall's decision, was to consider "certification of the parking use of the land over on Schoenphoester Road." Attorney McCann made the presentation in support of the Roncari application; Mr. Calsetta answered questions propounded by Board members. The Board was informed that the request for certification was under the zoning regulations as they existed on September 4, 1985, "in accordance with the Court's (Judge Barall's) ruling in this case", and, that the regulations "as they existed at that time permitted this type of use [valet parking] for Industrial Zones."
Two considerations were emphasized with respect to the 1989 application: whether the use (valet parking) would create or increase traffic or fire hazards; and, whether the use would depreciate the value of neighboring properties, or be detrimental to other property in the area. Regarding the first consideration, Roncari offered a traffic analysis prepared by Close, Jensen, and Miller, Consulting Engineers, which states:
 "A valet parking service generates no primary vehicular trips to its location other than those bringing its limited number of employees to and from work. All vehicular trips to the parking service are generated by the primary source which supplies the demand for its service. In this instance it is Bradley International Airport and its present expansion." (Emphasis in original text).
In connection with the second consideration, property values, Roncari presented the updated report of The David N. Collins Agency, Licensed Real Estate Brokers and Appraisers, concluding "that the highest and best use of the subject property continues to be for valet parking in conjunction with Bradley International Airport and . . CT Page 730 this proposed usage will in no way cause any diminution in value to any of the surrounding properties . . ." Mr. Ahmad, the traffic engineer for Close, Jensen, and Miller, and Mr. David Collins, were present at the July 10, 1989 public hearing; both addressed the Board, briefly.
Counsel for the instant plaintiffs did not make any statement regarding, or raise any issue of, increased traffic or reduction of property values. Rather, the principal question raised on behalf of the operators was whether valet parking was included as a permitted use under the regulation as it existed on September 4, 1985 (pre-"moratorium"); the Chairman replied: "If it isn't expressly prohibited, it is permitted . . . I think that is the way . . valet parking . . happened in Windsor Locks." Attorney Gersten also questioned whether the zoning officer, in the future, could "deny other people seeking to do a similar thing" and was told that the officer could, since the "present ordinance" prohibits valet parking in an industrial zone (whereas, in 1985, when Roncari initially filed, the existing ordinance did not).
At the close of the July 10, 1989 public hearing, the Roncari application received unanimous approval and, by letter dated July 14, 1989, Roncari's attorney was advised:
 "At the July 10, 1989 Public Hearing, your request for certification on . . . [Application No. 89-90-01] was unanimously approved based on your meeting all Windsor Locks and State of Connecticut criteria appertaining.
 ". . . the building official is hereby notified of this certification."
The instant appeal followed, on or about July 28, 1989.
II. Jurisdiction
To take advantage of a statutory right to appeal from a decision of an administrative agency, there must be strict compliance with the statutory provisions which created that right. Simko v. Zoning Board of Appeals, 206 Conn. 374, 377 (1989). The provisions are mandatory and jurisdictional; failure to comply subjects an appeal to dismissal. Id. CT Page 731
Shortly after the filing of this appeal, motions to dismiss were filed by both the Board and Roncari, grounded on failure to allege and establish aggrievement; extensive evidence has been received by the court on the aggrievement issue. Much more recently, and in part as the result of certain information disclosed through the evidence, Roncari moved for dismissal of the appeal on the basis that the plaintiffs named in the amended complaint are not legally existing entities capable of bringing the action. It is, therefore, necessary to relate the evidence presented to this court, in some detail, pertaining to the jurisdictional challenges.
A. Additional Evidence
First called was Mr. Guilmartin with regard to two of the plaintiffs denominated in the amended complaint as "Bradley Air Parking, Inc.," and "VIP Valet Parking, Inc." The witness testified that the former is located at 24 Ella Grasso Turnpike, and VIP at 75 Ella Grasso Turnpike. Mr. Guilmartin initially stated that he is managing partner of Bradley Air Parking and the president of Northeast Parking, d/b/a, VIP Parking. He later testified that he has an ownership interest in Standard Auto Body, Inc., d/b/a, Bradley Air Parking, and in Northeast Parking, Inc., d/b/a VIP Parking. However, neither Standard Auto Body, Inc., d/b/a, Bradley Air Parking, Inc., nor Northeast Parking, Inc., d/b/a VIP Parking are property owners. Mr. Guilmartin stated that Bradley Air Parking Limited Partnership is the owner of the property located at 24 Ella Grasso Turnpike; Bradley Air Parking Limited Partnership is a different entity from Bradley Air Parking, Inc. He stated that the Route 7 Corporation is the owner of property located at 75 Ella Grasso Turnpike; Northeast Parking, Inc., d/b/a, VIP Valet Parking leases the property at 75 Ella Grasso turnpike from Route 7 Corporation.
Mr. Guilmartin testified that "we" acquired Bradley Air Parking about three years ago, and that he has been associated with VIP Parking for approximately a year and one-half. Bradley Air Parking operates on about 7.9 acres, and VIP on about 4.7 acres. In Mr. Guildmartin's lay opinion, "if we do not win this case, the value of my property is going to go down forty to fifty percent." The witness premised this opinion on the assertion that there are now approximately thirty acres of privately owned land utilized for valet parking in CT Page 732 Windsor Locks, and if that suddenly doubles (with the addition of the Roncari tract), "I don't think you have to be an appraiser to figure out that your property values are going to go down somewhat." Mr. Guilmartin also stated that "we" purchased the land at a price predicated "on the Town's position that there would be no more valet parking", and, had "we" known twice as much land would be available for that purpose, "we would never have paid the price we paid for the land."
Mr. Guilmartin further contends that the price paid by Roncari for its land was substantially less than the price per acre paid by Bradley Air Parking Limited Partnership and, therefore, Roncari is not required to park as many cars per acre, or charge as much money per car, to carry the cost of buying the land; such circumstance, in the opinion of the witness, affords Roncari "a distinct business advantage". Additionally, referring to the tax assessor's "Property Street Card", the witness stated that the granting of the Roncari application, and the availability of another thirty acres for valet parking, will reduce the "gross income" of his valet parking operations.
With respect to the Roncari application, Mr. Guilmartin, over objection, testified that "any new business in this area, generating a lot of cars, is going to add to a problem that already exists, and that is congestion and accidents, all within this . . . area." When asked what effect traffic congestion has on his business, he stated ". . . the foundation of our business is that we get people to the airport quickly . . . If there is a lot more traffic . . . and a lot more congestion, we will not . . . be able to get them there in three or four minutes [;] [i]t may become five or six . . or seven minutes." Mr. Guilmartin conceded that he did not have any background in traffic engineering and, that although present at the July 10, 1989 public hearing on the Roncari application, neither he nor his attorney made any statement to the Board regarding traffic congestion.
Plaintiffs next called Mr. Guy Piccolo who stated he is the president of Piccolo's Valet Parking, which is located at 50 Ella Grasso Turnpike. Additional information developed, however, indicated that, in fact, a corporation known as Bradley Airport Valet Parking, Inc., does business under the tradename of Piccolo's Bradley Valet Parking; the real property at 50 Ella Grasso Turnpike where the corporation does business as Piccolo's Bradley Valet Parking is owned by Grace Alampi, CT Page 733 Guy Piccolo's cousin. The business, according to Mr. Piccolo, is operated on about a 2 acre portion of a larger tract, and it is leased by the corporation from Ms. Alampi; as an officer of the lessee corporation, and the operator of the valet parking business, Mr. Piccolo testified that, in his opinion, the present value of the entire tract of land, and the business, was about two and one-half million; he testified that his opinion as to value was not "at all attributable" to the Board's approval of the Roncari application. As did Mr. Guilmartin, this witness also expressed the view that the granting of the Roncari application, and the consequential availability of additional acreage for valet parking, would lower the value of his business and the property on which it operates.
With regard to traffic, this witness testified: ". . . if there is a lot more traffic we are going to have problems, especially on the corner of Ella Grasso Turnpike and Schoenphoester where there is a light." He testified that an increase in traffic resulting from the Board's decision will "affect my business . . . we try to get customers back and forth to the airport quickly . . . that's what we sell [as] our service . . . if there is a lot more traffic, we are going to have problems . . . it's going to slow vehicles down . . . [i]nstead of ten, twelve minutes round trip, it could increase it fifty percent."
As with the previous witness, Mr. Piccolo admitted that he had no background in traffic engineering, and conceded that he could not know how many cars per day would be travelling to and from the Roncari facility, or the number of van trips generated by the proposed Roncari valet parking operation. Mr. Piccolo testified that he too was present at the July 10, 1989 public hearing on the Roncari application and expressed no complaints that evening regarding anticipated traffic problems, or depreciated property values.
The next witness called by plaintiffs, Mr. Robert Gosselin, testified that he was connected with Airport Valet Parking, operating at 35-37 Ella Grasso Turnpike (Route 75). According to Mr. Gosselin, he and his wife own the land at 35-37 Ella Grasso turnpike and lease it to GMG Enterprises, Inc., d/b/a Airport Valet Parking. As stated, Airport Valet Parking withdrew from this appeal on January 11, 1991.
Mr. Gosselin opined that all parking services along the Ella Grasso Turnpike, and particularly those CT Page 734 located before the traffic light would suffer from additional traffic congestion, with concomitant delays in transporting customers to and from the airport, as a result of the approval of Roncari's application. He stated: ". . . if 33 acres becomes available for parking, 33 acres will allow approximately [3300] cars to be parked on that particular acreage if it were all full". and if "seventy percent of those people came in off of route 20, on to Route 75 to Schoenphoester Road, I would think there would be a very dramatic problem with traffic on Route 75 and Schoenphoester Road." Although this witness testified that cars proceeding to the Roncari facility on Schoenphoester Road would pass his valet parking business on Route 75, he acknowledged that there were other routes of access to Schoenphoester Rd. He confirmed that three out of the four means of access to Schoenphoester Road did not involve travel in front of 33-35 Ella Grasso Turnpike or travel through and across the traffic light.
Mr. Gosselin did not testify that land values at 35-37 Ella Grasso Turnpike would be affected adversely by traffic. In his testimony, however, he claimed that Trusthouse Forte, an English concern, had expressed an interest in purchasing his motel and parking facility, but changed his mind when Roncari received approval to compete. Defendants argue, persuasively, that Mr. Gosselin did not present any letter, an offer, an appraisal, a memorandum, or any other non-verbal evidence to substantiate his claim that Trusthouse Forte was ever interested in the facilities. Defendants also contend that when they had located Trusthouse Forte representatives, who were prepared to testify differently regarding the claimed negotiations, Mr. Gosselin withdrew his business as a party to this appeal, thus casting his entire testimony respecting negotiations with Trusthouse Forte in considerable doubt.
Mr. Joseph Calsetta, associated with Roncari, was called by plaintiffs; he expressed the view that Roncari's valet parking customers would most likely proceed to the end of Route 20, and then on to Schoenphoester Road, as opposed to exiting Route 20, at Route 75 (thereby passing plaintiffs' businesses).
The plaintiffs have asserted that they were prevented from expanding their valet parking operations as a result of the moratorium. Mr. Guilmartin testified that the moratorium prevented him from expanding his business; the credibility of such testimony, however, was CT Page 735 placed in question by the testimony of Mr. Keith Kabeary, called by defendants, and by related documentary evidence (including instruments relating to leased land). It would appear that at least with respect to Guilmartin, there was an actual expansion of the valet parking operation during the so called "moratorium".
As discussed previously, there is also before the court the entire record of the administrative proceedings, which includes the Close, Jensen and Miller report/study, concluding that the proposed Roncari facility on Schoenphoester Road would not have a significant impact on traffic, and, the appraisal studies of The David N. Collins Agency, concluding that the operation of the Roncari facility would not result in any depreciation in value of surrounding properties.
B. Supplemental Motion To Dismiss: lack of subject matter jurisdiction as named plaintiffs are not legally existing entities. Plaintiffs' Request For Leave To Amend Complaint.
While the aggrievement issue was pending before this court, Roncari, on June 14, 1991, filed a "Supplemental Motion to Dismiss, With Exhibits." Attached to the supplemental motion were documents consisting of certified copies of records from the Office of the Secretary of State, and certified copies of trade name certificates recorded in the Windsor Locks Town Clerk's office. Roncari's supplemental motion to dismiss was adopted by the defendant Board by pleading filed June 16, 1991.
As stated, the amended complaint (10/10/89) denominates the plaintiffs as: Airport Valet Parking, Inc.; Bradley Air Parking, Inc.; VIP Valet Parking, Inc.; and, Piccolo's Valet Parking, Inc. As indicated by the testimony of Messrs. Guilmartin, Piccolo, and Gosselin, those denominations are inaccurate. The records of the Secretary of State disclose that as of May 15, 1991, there was no Connecticut corporation, or foreign corporation authorized to do business in Connecticut, by the name of Airport Valet Parking, Inc. A certified copy of a Certificate of Adoption of Trade Name, dated February 4, 1982, shows GMG Enterprises, Inc. conducting and transacting business in the town of Windsor Locks under the full name of Airport Valet Parking, with a post office address of 37 Ella Grasso Turnpike; the use of the trade name continued to the date of the certification, CT Page 736 May 9, 1991. Thus, it appears that Gosselin's appeal was brought in the name of a corporation which did not exist; however, that appeal has been withdrawn.
With reference to the Guilmartin businesses, the records of the Secretary of State show that a certificate of incorporation was filed on June 5, 1986 for Bradley Air Parking, Inc., and that certificates of amendment or the corporate name were filed as follows:
9/29/88, changing the name to Don's Air Parking, Inc.; 3/22/90, changing name to Executive Valet Parking, Inc. According to the records, the corporation, Executive Valet Parking, Inc., was in existence and in good standing as of the date of certification, May 16, 1991. A certificate of trade name, filed November 26, 1973, shows Standard Auto body, Inc. conducting and transacting business in Windsor Locks under the full name of Bradley Air Parking; Mr. Donald P. Flynn signed the Certificate as President of Standard Auto Body, Inc., with a post-office address of 91 1/2 Turnpike Rd. A prior Certificate on file with the Town Clerk, filed on or about October 17, 1970, shows Donald P. Flynn, d/b/a Bradley Air Parking, with a post-office address of 170 Turnpike Road. Mr. Flynn's affidavit, dated July 16, 1991, was submitted; it states that the affiant was an incorporator and president of Bradley Air Parking, Inc., and has remained president under its subsequent corporate names, up to, and including its present corporate name, Executive Valet Parking Inc. Further, the affidavit states that Mr. Flynn is the President of Standard Auto Body, Inc., which has registered the tradename of Bradley Air Parking for use by the corporation in the town of Windsor Locks. Mr. Flynn indicates that Standard Auto Body, Inc. is not a party to this appeal, nor has it authorized anyone to file such an appeal in the name of Bradley Air Parking; further, that "[n]either Bradley Air Parking, Inc., nor Don's Air Parking, Inc., nor Executive Valet Parking, Inc. is, or ever has been, a party to [this] . . . appeal, nor has either of them authorized the filing of such appeal on behalf of, or in the name of, Bradley Air Parking, Inc. At trial, by agreement of the parties, Mr. Guilmartin was permitted to testify; with reference to Mr. Flynn's affidavit. Mr. Guilmartin testified that in the summer of 1988, he and Flynn entered into a "sales transaction" whereby the latter sold Bradley Air Parking to Bradley Air Parking Limited Partnership, of which Guilmartin is the managing general partner. A certified copy of a certificate of trade name, filed with the Windsor Locks Town Clerk on June 27, CT Page 737 1988, shows Bradley Air Parking Limited Partnership conducting and transacting business in Windsor Locks under the full name of Bradley Air Parking, with a post office address of 24 Ella Grasso Turnpike.
The records of the Secretary of State reveal no Connecticut corporation, or any foreign corporation authorized to do business in Connecticut, denominated as VIP Valet Parking, Inc. As stated heretofore, Mr. Guilmartin testified he had an ownership interest in Northeast Parking, Inc., d/b/a VIP Parking. A certificate of trade name, filed December 21, 1988, shows Northeast Parking, Inc. conducting and transacting business in Windsor Locks under the full name of VIP Valet Parking.
The records of the Secretary of State disclose no Connecticut corporation, or any foreign corporation authorized to do business in Connecticut, by the name of Piccolo's Valet Parking, Inc. As stated previously, Mr. Piccolo testified that a corporation known as Bradley Airport Valet Parking, Inc. does business as Piccolo's Bradley Valet Parking, on land leased by the corporation from Ms. Alampi. A certificate of tradename, filed November 8, 1988, shows the tradename of Piccolo's Bradley Valet Parking registered to the corporate entity Bradley Airport Valet Parking, Inc., 50 Ella Grasso Turnpike.
Defendants' have moved to dismiss the appeal on the basis that the corporate entities listed as plaintiffs in the amended complaint do not exist; that is, none are corporate entities registered with the Secretary of State. To the extent that the names of the plaintiffs listed in the amended complaint resemble the registered tradenames, defendants contend such do not constitute legally recognized entities capable of instituting this action. Plaintiffs, requesting leave to amend, argue that the misnomers were non-prejudicial to the defendants, that appellants were identified in both the original and amended complaints as the operators of valet parking facilities in Windsor Locks and claimed to be adversely affected by the Board's decision, that defendants were well aware of the interests that plaintiffs were asserting in this appeal, that appellants have never misrepresented their legal capacities to maintain this action, that defendants waited until long after the completion of the evidentiary hearings to raise the question of appellants" legal capacity to sue, and that the request to amend is simply to correct CT Page 738 inaccuracies in the names of the plaintiffs as set forth in the original and amended complaints. Plaintiffs stress that the allowance of the second amended complaint would not prejudice defendants, or result in any surprise, and would not occasion any further delay.
Plaintiffs' proposed Second Amended Complaint (6/26/91) is identical to the Amended Complaint (10/9/89) except for paragraphs #1 through #4, identifying the plaintiffs, as follows:
 1. Airport Valet Parking is a tradename registered for GMG Enterprises, Inc. in the Town of Windsor Locks. This entity is no longer a party to this appeal but was the first-named plaintiff in the original complaint. As a result, Airport Valet Parking is named herein only for court docketing purposes.
 2. Bradley Air Parking is a tradename registered for Standard Auto Body, Inc. in the town of Windsor Locks.
 3. VIP Valet Parking is a tradename registered for Northeast Parking, Inc. in the Town of Windsor Locks.
 4. Piccolo's Bradley Valet Parking is a tradename registered for Bradley Airport Valet Parking, Inc. in the Town of Windsor Locks.
If the court allowed the proposed amendments, then Standard Auto Body, Inc., Northeast Parking, Inc. and Bradley Airport Valet Parking, Inc. would become the named corporate plaintiffs. GMG Enterprises, Inc., d/b/a, Airport Valet Parking, having withdrawn from this appeal, would not be included as a named corporate plaintiff.
A motion to dismiss is the proper pleading to assert lack of subject matter jurisdiction at any time during the proceedings. Conn. Prac. Bk. Section 143; Daley v. Hartford. 215 Conn. 14 (1990); Neyland v. Board of Education, 195 Conn. 174, 177 (1985). "The trial court correctly considered the defendant's motion to dismiss before reaching the named plaintiff's request to amend . . . when a question of Jurisdiction is brought to the court's attention, that issue must be resolved before CT Page 739 the court can move on to other matters." Isaac v. Mount Sinai Hospital, 3 Conn. App. 598, 600 (1985); Baldwin Piano Organ Co. v. Blake, 186 Conn. 295, 297-98 (1982).
"It is elemental that in order to confer jurisdiction on the court the plaintiff must have an actual legal existence, that is he or it must be a person in law or a legal entity with legal capacity to sue." Estate of V. Donald Schoeller v. Becker, 33 Conn. Sup. 79
(1975). "If the action was not started by a legal person, it is a nullity and there is nothing before the court to amend." Id.[1]
In both Estate of Schoeller, supra, and Isaac v. Mount Sinai Hospital, 3 Conn. App. 598, 600 (1985), it was held that a decedent's estate is not a legal entity and, not having a legal existence, it can neither sue nor be sued. In these cases, an estate was referred to as "neither a natural nor artificial person, but merely a name to indicate the gum total of the assets and liabilities of the decedent or incompetent."[2]
Defendants here argue that since the plaintiffs named in the amended complaint are non-existent, or, at best, resemble merely the wording of registered tradenames, the circumstances with regard to the initiation of this action are analogous to those of Schoeller and Isaac, where dismissals were predicated on the named plaintiffs not having status as a legal entities capable of bringing suit.
Here, the corporate names used in the amended complaint are substantially identical to the registered tradenames under which the four corporations (having corporate names substantially different from those set forth in the amended complaint) conduct valet parking businesses in Windsor Locks. As stated, plaintiffs maintain that the descriptions as corporate entities in the amended complaint constituted merely unintentional misnomers, and that the purpose of their proposed amendment is simply to correct the misdescriptions. In ITT Semiconductors v. Matheson Gas Products, et al, 5 Conn. L. Rptr. No. 4, 80 (10/28/91), the plaintiff was described in the writ as ITT Semiconductors, a division of ITT Corporation; confronted with motions to dismiss, asserting an absence of subject matter jurisdiction in that "a division is not a legal entity, and lacks capacity to sue," plaintiff sought permission to amend the caption of the complaint to read "ITT Corporation, doing business as ITT Semiconductors." In denying the motions to dismiss, the Court noted that our Supreme CT Page 740 Court has stated: "The effect given to such a misdescription usually depends upon the question whether it is interpreted as merely a misnomer or defect in description, or whether it is deemed a substitution or entire change of party; in the former case an amendment will be allowed, in the latter it will not be allowed." World Fire and Marine Insurance Co. v. Alliance Sandblasting Co., 105 Conn. 640, 643-44 (1927).
The World Fire decision is discussed and analyzed at some length in Ducey v. Walsh Construction Co., 6 Conn. App. 256, 259 (1986). In Ducey, plaintiff sued Walsh Construction Company, Ltd., which was an existing Delaware corporation; the correct defendant, against which any liability would have existed, was "Walsh Construction Company, A Division of Guy F. Atkinson Company." The Appellate Court found error in the dismissal of the Ducey complaint, citing World Fire, and upon observing that as in World Fire, the principals of both Walsh Construction Co., Ltd., and Walsh Construction Co., A Division . . ., were substantially the same, had actual notice of the action brought, knew who was the proper party defendant in the action, and did not appear to have been misled, to their prejudice, by the misidentification contained in the writ. Of course, in Ducey, unlike the present case, an actual legal entity, the Delaware corporation, was the originally named party (here, the originally named parties were non-existent corporations). Also cited, and discussed in Ducey was Motiejaitis v. Johnson, 117 Conn. 631 (1933); there, the originally named party was "J. Johnson sons, Incorporated, a corporation duly organized under the laws of the State of Connecticut, and having an office and principal place of business in the City of Waterbury." After trial and rendition of a verdict, but before entry of judgment, the plaintiff moved to amend the writ substituting "Joseph C. Johnson and Albert J. Johnson being co-partners in trade doing business under the name of J. Johnson Sons;"[3] the Supreme Court, after observing that the defendants proceeded to trial raising no objection to the misnomer of parties until after the verdict was rendered, and that a mere amendment deleting the word "Incorporated" would have allowed plaintiff to sue the partnership, found "no error in permitting an amendment naming the real parties". Significantly, in Motiejaitis, there was "no such corporation as J. Johnson Sons, Incorporated;" similarly, in the instant case, the corporations originally listed did not exist.
World Fire dealt specifically with a tradename; CT Page 741 there, the original writ was against "The Alliance Sandblasting Company, a corporation of New York . . ." A New York corporation bearing the name "Alliance Sandblasting Corporation" did, in fact, exist; however, plaintiff's subrogor had contracted with the sole proprietorship known as "Alliance Sandblasting Company." a tradename registered in New York under which one Julius Goodman did business. The Supreme Court noted that both the corporation and the sole proprietorship occupied the same offices in New York City, that service of the writ was made, pursuant to an order of notice, by registered mail addressed to the business at its New York address, and that Goodman had actual notice of the action; the Court went on to state;
 "The . . mistake was not as to the entity itself — not as to the party sued, but in describing what kind of an entity the [party] was; it sued the proper party, but in so doing misdescribed that party, not in respect to name, but solely as to status, as being an artificial instead of a personal entity . . . The change made by the amendment did not affect the identity of the party sought to be described, but merely made correct the description of the real party sued; it did not substitute or bring in a new party."
105 Conn. supra at p. 643.
In the case at bar, as in Montiejaitis, each originally denominated party was a non-existent corporation. In World Fire, the permitted amendment was from an erroneously named corporate party to an individual (Julius Goodman);[4] similarly, in this case, the requested amendment is merely to correct the description of the original plaintiffs to corporations that are doing business under registered tradenames, which tradenames are substantially identical to the names used to describe the plaintiffs in the amended complaint. Here, both Roncari and the Board knew the appeal, which had been pending for a matter of years before the motion to dismiss on this ground was filed, was brought by the operators of competing valet parking businesses around the corner on Route 75. Surprise is neither alleged in CT Page 742 the dismissal motion, nor is it in any way evident from the facts disclosed through the evidence. And, as stated, defendants have not claimed, nor articulated, any prejudice resulting to them by an allowance of the appeal to continue with the corrected descriptions of appellants. Much detail regarding the actual, legal composition of plaintiffs' businesses was developed on the record during the early stages of the lengthy evidentiary hearings conducted in this case; these hearings were completed several months before trial, but defendants waited until just before trial to file motions to dismiss on this ground. "`Subject matter jurisdiction is the power of the court to hear and determine cases of the general class to which the proceedings in question belong'", and, a "`court does not truly lack subject matter jurisdiction if it has competence to entertain the action before it.'" ITT Semiconductors v. Matheson Gas Products, et al, supra.
Both General Statutes Section 52-109 and Conn. Prac. Bk. Section 101 provide: "When any action has been commenced in the name of the wrong person as plaintiff, the court may, if satisfied that it was so commenced through mistake, and that it is necessary for the determination of the real matter in dispute so to do, allow any other person to be substituted or added as plaintiff." Prac. Bk. Section 6, entitled "Rules To be Liberally Interpreted", states: "The design of these rules being to facilitate business and advance justice, they will be interpreted liberally in any case where it shall be manifest that a strict adherence to them will work surprise or injustice." In Johndrow v. State,24 Conn. App. 719, 722, fn. 1 (1991), the Appellate Court observed that Prac. Bk. Section 101 "contemplates a motion to substitute plaintiffs where substitution `is necessary for the determination of the real matter in dispute'".[5] In the instant case, the actual dispute centers on (and has centered thereon since just after the filing of the appeal when the first motions to dismiss were brought) whether the competing Route 75 valet parking enterprises are aggrieved by the 1989 action of the Board on Roncari's application. It is that issue on which all parties to this appeal have concentrated maximum time and effort.
The circumstances of the instant case are somewhat unique in terms of the time duration the appeal has been pending, the extraordinary time and effort all parties have devoted to the aggrievement issue, and the realistic familiarity of the parties with one another. CT Page 743 It is in the interest of furthering the litigation and advancing justice to permit a second amendment to the complaint correcting the mistaken misnomers regarding plaintiffs' actual identities.[6]
C. Aggrievement
General Statutes Section 8-8(b) states that "any person aggrieved by any decision of [the] board may take an appeal to the superior court for the judicial district in which the municipality is located". (Emphasis added). Plaintiffs allege that they are classically aggrieved by the Board's decision.
Aggrievement is a prerequisite to maintaining an appeal pursuant to General Statute Section 8-8; Smith v. Planning and Zoning Board, 203 Conn. 317 (1987); aggrievement is an essential element of the trial court's subject matter jurisdiction. Primerica v. Planning and Zoning Commission, 211 Conn. 85, 92 (1989); Pierce v. Zoning Board of Appeals, 7 Conn. App. 632, 635 (1986). Plaintiffs have the burden of establishing aggrievement. Caltabiano v. Planning and Zoning Commission, 211 Conn. 662,667-668 (1989); Fuller v. Planning and Zoning Commission, 21 Conn. App. 340. 343 (1990).
In both Primerica and Pierce, the court set forth the two ways in which a party may qualify as aggrieved under Connecticut law "statutory aggrievement" and "classical aggrievement". Pursuant to Section 8-8(a), a person may derive standing to appeal based solely upon his status as an abutting landowner or as a landowner within 100 feet of the subject property; this type of aggrievement is referred to as "statutory aggrievement". Plaintiffs here do not claim that they are statutorily aggrieved.
Section 8-8 also permits an appeal from a decision of a zoning authority by one aggrieved as a result of a contested decision. Compliance with the classical aggrievement requirement involves application of a twofold test: first, the party claiming aggrievement must demonstrate a specific, personal and legal interest in the subject matter of the decision, as distinguished from a general interest, such as is the concern of all members of the community as a whole; and second, the party claiming aggrievement must establish that this specific, personal and legal interest has been specifically and injuriously affected by the decision. Hall v. Planning Commission, 181 Conn. 442, 444 (1980). CT Page 744 As stated, this type of aggrievement is commonly referred to as "classical aggrievement". Mystic Marinelife Aquarium, Inc. v. Gill, 175 Conn. 483, 491-93 (1978). Aggrievement presents a question of fact to be determined by the trial court on appeal. Hughes v. Planning 
Zoning Commission, 156 Conn. 505, (1968.
Here, plaintiffs' allegations of aggrievement are contained in paragraph 3 of the amended complaint (October 10, 1989) and in paragraph 7 of the second amended complaint (June 26, 1991). Plaintiffs have alleged classical aggrievement, as follows:
 The plaintiffs are aggrieved by the decision of the Board because the plaintiffs' lands are substantially affected and materially depreciated by the Board's decision insofar as the properties which the plaintiffs own or rent are devoted to a use that would be adversely affected by the decision, because of a 1987 regulation referred to as the `moratorium'. The moratorium had the effect of fixing the number of valet parking spaces in Windsor Locks and to influence the valued [sic] of existing spaces. The plaintiffs had a reasonable expectation that their parking lots would maintain their value and the plaintiffs have been deprived of the opportunity to expand [sic] size of plaintiffs' lots as a result of the moratorium. Additionally, plaintiffs are entitled to equal treatment by the Town and are not permitted to create additional spaces or to expand their parking lots because of the moratorium.
(1) Leasehold Interest
The evidence before the court establishes that the interests in property of the plaintiffs is that of lessees. Standard Auto Body, Inc., d/b/a, leases the property where it operates its valet parking operation CT Page 745 from Bradley Airport Parking Limited Partnership. Northeast Parking, Inc., d/b/a, leases from Route Seven Corporation, Inc., the corporation that owns 75 Ella Grasso Turnpike. And, Bradley Airport Valet Parking, Inc. leases the property it uses from the landowner, Grace Alampi.
In Primerica v. Planning and Zoning Commission, supra, it was stated that a precise standard had not been set forth defining the required interest that a nonowner must possess in order to be an aggrieved party under Section 8-8. The Primerica Court further stated: "we have held that the extent to which a party with an interest in the property other than that of an owner is aggrieved depends on the circumstances of each case, because the concept of standing is a practical and functional one designed to ensure that only those parties with a substantial and legitimate interest can appeal an order." 211 Conn. supra at p. 93. In the instant case, unlike Primerica, plaintiffs presented virtually no evidence regarding the terms of the leases between the named corporate plaintiffs and the property owners, except for the testimony of Mr. Guilmartin to the effect that the lease between Northeast Parking, Inc. and Route Seven Corporation is "like fifteen or nineteen years." Nevertheless, it is reasonably clear that the plaintiff corporations operate their businesses on commercial property which they occupy pursuant to commercial leases, and the court reads Primerica as holding that a leasehold interest is generally sufficient for consideration as an aggrieved party.[7] See Also: Gregorio v. Zoning Board of Appeals, 155 Conn. 422 (1967).
(2) Traffic
Plaintiffs' allegation of aggrievement makes no specific reference to increased traffic and/or traffic congestion. However, the subject was before the Board, not at the behest of plaintiffs, or their legal representatives, but through the Close, Jensen and Miller traffic analysis presented by Roncari. In the proceedings before this court, plaintiffs called witnesses, none of whom were traffic engineers, who expressed the view that the Roncari operation would increase traffic on route 75 and on Schoenphoester Road, thereby extending van time to and from the airport terminal.
In Jarvis Acres, Inc. v. Zoning Commission,165 Conn. 41, 49 (1972), our Supreme Court stated: CT Page 746
 "An important purpose of zoning is to alleviate traffic congestion. General Statutes Section 8-2 provides, inter alia, that zoning regulations `shall be designed to lessen congestion in the streets'. . . `It is not the over-all volume of daily traffic, but congestion in the streets, that is, density of traffic which is referred to in the statute.'"
In Gregorio v. Zoning Board of Appeals, supra, at p. 426, reference is made to "the probability of increased traffic hazards and traffic congestion" in the aggrievement context.
The court has carefully considered all of the evidence, as well as the full administrative record. Even viewing the testimony of plaintiffs' witnesses in its best light, the conclusion set forth in the Close, Jensen and Miller report is, in the court's view, essentially sound; that is, a valet parking facility generates very little primary traffic or vehicular trips to its location (other than its few employees), but rather it is the airport volume which supplies the demand for valet parking services. With the addition of the Roncari valet parking facility on Schoenphoester Road, the number of persons traveling by car to and from Bradley Airport would not change; rather, those travelers would simply have an additional, competing car storage service which they might choose to utilize; as the Close, Jensen and Miller traffic engineer concluded, the opening of such an additional facility would not, in and of itself, increase the number of cars coming and going from the Bradley Airport area.[8]
Plaintiffs maintain that the evidence established the Board's decision will cause an increase in traffic congestion and traffic hazards along the routes used by them to taxi customers to and from the airport. They argue that since their businesses are dependent upon the free flow of traffic, they will be specially injured by the disruptions which will occur in their daily business activities. Plaintiffs' witnesses testified that if a new business increased traffic in the area, then the vans of their respective valet parking operations would be delayed.
As stated heretofore, to prove classical CT Page 747 aggrievement, plaintiffs must establish a specific, personal and legal interest in the subject matter of the decision, as distinguished from a general interest such as the concern of all members of the community, and that they are specially and injuriously affected in their property or other legal rights. Caltabiano v. Planning 
Zoning Commission, supra at p. 668; Pierce v. Zoning Board of Appeals, supra at p. 636. "Mere generalizations and fears do not prove that an appellant is an aggrieved person." Id.
In the instant case, plaintiffs' evidence did not establish the number of cars that would utilize the proposed Roncari facility, the times of day that the cars would arrive or leave, the routes that those cars would take, or the capacity of those routes to absorb those cars. They did not present any traffic engineer or consultant, or a neighboring non-competing business owner, who could provide objective testimony concerning probable traffic congestion resulting from the addition of the proposed Roncari parking facility. As plaintiff's evidence stands, it lacks credibility and is, in the court's view, highly speculative and substantially, if not entirely, hypothetical. None of the plaintiffs had a traffic survey done, nor even asked their own customers as to the routes taken to and from their respective lots. Thus, conclusions about the amount and direction of traffic to and from the Roncari facility, as the evidence stands, is substantially predicated upon supposition and speculation.
Plaintiffs have argued that the proposed Roncari facility would redistribute the existing traffic in such a manner as to increase traffic congestion on Schoenphoester Road and at the intersection of Route 75. However, it is the court's view that the entire evidence suggests, or would support, a contrary conclusion, that traffic congestion actually would be decreased by the proposed Schoenphoester Road facility (or such redistribution) since a number of valet parking patrons well might utilize alternative routes to and from the Roncari operation.
Essentially, plaintiffs' claims of increased traffic resulting from the Board's decision on the Roncari application is premised on the testimony of Messrs. Piccolo, Gosselin (whose company has withdrawn from the appeal), and Guilmartin (and, perhaps, Mr. Calsetta). As stated, in the court's view, the testimony of plaintiffs' three principal witnesses is highly CT Page 748 speculative, and has not been supported by any data provided by a traffic engineer or other qualified expert.[9]
Mr. Gosselin essentially states that the Roncari facility might redistribute the existing traffic so as to increase congestion.[10] Mr. Guilmartin, conceding that he had no background in traffic engineering, stated simply that "any new business", in this area, "generating a lot of cars", is going to add to the existing problem — congestion and accidents. Again, this testimony does not establish whether the added Roncari facility will add more cars to the area, or simply redistribute the existing volume of cars in terms of those seeking to use valet parking facilities; the Close, Jensen and Miller traffic analysis strongly suggests the latter. It is not evidence establishing a probability of an increase in traffic congestion due to the decision of the Board. .
The court concludes that the evidence presented by the corporate plaintiffs does not establish a probability of traffic congestion, or any likely increase in traffic congestion, resulting from the Board's decision on the Roncari application.[12]
(3) Depreciation of Land Values
It is the position of the named corporate plaintiffs that the value of the land which they lease will be materially depreciated as a direct result of the Board's decision granting the Roncari application. They presented no expert appraisal testimony in support of this contention. As stated, the record contains the report(s) of The David N. Collins Agency, Licensed Real Estate Brokers and Appraisers, concluding that the "proposed usage will in no way cause any diminution in value to any of the surrounding properties . . ." Plaintiffs cited initially, Hickey v. City of New London,153 Conn. 35, 38 (1965), and, Puskarz v. Zoning Board of Appeals, 155 Conn. 360, 366 (1967). In Hickey, the Court rejected a conclusion that the plaintiffs were aggrieved absent a finding that "any of [their] properties will be depreciated in value as a result of the [zoning action]"; and, in Puskarz, the Court found the evidence supported a finding of aggrievement "because of the depreciation in value of [plaintiffs'] property which would result from the construction of a convalescent home, and the increased traffic incident thereto."
Preliminarily, it is observed that the testimony of plaintiffs' witnesses, as owners, or part owners of property, on the issue of land values is of CT Page 749 somewhat questionable relevance as the interests of the named corporate plaintiffs are not those of ownership of land, but rather, concern leasehold interests. A depreciation of an owner's land value need not necessarily adversely affect the value of the lessee's interest in the leasehold. Thus, even if the evidence supported a finding of a devaluation of the land on which plaintiffs operate their businesses, which land they do not own, that devaluation would not necessarily negatively affect the interests of the corporate plaintiffs as named in the second amended complaint (which are simply lessees).[13] Thus, the named corporate plaintiffs' allegation of aggrievement, based on depreciation in value of the real property, appears to be without basis. Nevertheless, the court will consider the evidence presented as it relates to the issue of the alleged depreciation in value.
Plaintiffs have argued that the evidence indicates the value of the land they lease will be depreciated because one method, recognized by the Windsor Locks Appraiser's Office, evaluates property by determining the price charged per parking space. Plaintiffs assert that since the Roncari application involves a valet parking facility which could double the number of valet parking spaces in Windsor Locks, the land which they lease will be reduced in value to the extent that plaintiffs will be subject to excess capacity. That plaintiffs will be subject to excess capacity and reduced occupancy because some customers will utilize the Roncari facility is, in the court's view, simply a circumstance of increased competition. A claim based on increased business competition, however does not satisfy the test of aggrievement under Connecticut law. Mott's Realty Corp. v. Town Plan and Zoning Commission, 152 Conn. 535, 537 (1965). See also: Gregorio v. Zoning Board of Appeals, supra at p. 426 (". . . that the proposed gasoline station would result in competition harmful to the plaintiff's business would not be sufficient to qualify the plaintiff as an aggrieved person"). Simply because the granting of the Roncari application results in another valet parking facility at Bradley Airport, with which plaintiffs will have to compete, does not render the named plaintiffs aggrieved parties for purposes of this zoning appeal.[14]
The testimony of the plaintiffs' witnesses was the opinion testimony of interested person; as stated, no independent expert testimony was presented regarding any diminution of property values resulting from the Board's CT Page 750 action on Roncari's application. Defendants argue, persuasively, that the establishment of aggrievement solely on the basis of the lay opinions of interested persons that land which their businesses lease might diminish in value as the result of the zoning action, and thereby affect their interests as business lessees, substantially dilutes the jurisdictional requirement of demonstrating classical aggrievement.[15] Although plaintiffs need only prove a possibility of aggrievement; Huck v. Inland Wetlands and Watercourses Agency,203 Conn. 525, 530 (1987); they must do so with reasonable certainty; and, it is necessary to present specific facts demonstrating the claimed aggrievement. Berani [Berlani] v. Zoning Board of Appeals of Plainville, 160 Conn. 166, 169 276 (1970); Puskarz v. Zoning Board of Appeals, supra at p. 366; Gregorio v. Zoning Board of Appeals, supra at p. 426. In the court's view, plaintiffs here have failed, on the evidence presented, to meet such requirements.
(4) Adequacy of Notice
Plaintiffs next argue that the Board failed to give proper notice of the Roncari application in 1989 and, therefore, under Town of North Haven v. Planning and Zoning, 2 CTLR 196 (1990), they are aggrieved parties. North Haven involved a municipal notification statute, Section 8-3h; that statute specifically sets forth four circumstances under which notice of the pendency of an application, etc., must be given to a neighboring town: property affected is within five hundred feet of town boundary; significant traffic to completed project will use streets of adjoining municipality to enter and exit site; sewer or water drainage from project will flow through or significantly impact on systems within adjoining municipality; and, water run-off from site will impact on streets or municipal or private property within adjoining town. The purpose of a municipal notification statute is to require that an adjoining municipality be given notice of the public hearing, and the right to be heard at that hearing, when action concerning any project on a site will affect the adjoining municipality under one or more of the four circumstances set forth. No such operative circumstances are set forth in the statute(s) governing notice to residents. General Statutes Section8-3, 8-3c, and 8-7.
In North Haven, the Court equated the right to receive notice pursuant to a municipal notification statute to one's having a "specific, personal and legal interest in the subject matter of the decision", and CT Page 751 concluded that failure to give such notice injuriously affected the municipality's right to be heard.[16]
Accordingly, the court determined that both requirements of the classical aggrievement test were satisfied, stating:
 "[T]he failure to give North Haven notice as required by the Municipal Notification Statute satisfies both prongs of the test for classical aggrievement. North Haven, by establishing in this case the elements required to activate the Municipal Notification Statutes has, as a result of this right granted by the legislature, a `specific, personal and legal interest in the subject matter of the decision' made by the Commission. And, of course, the failure to give notice to North Haven injuriously affected North Haven's right to be heard before that decision was made by the Commission."
2 CTLR supra at p. 198
The present case differs from North Haven, in that there are no specified circumstances which activate a right to notice under the public notice statute, as are contained in Section 8-3h; therefore, under the reasoning of North Haven, the first prong of the classical aggrievement test does not pertain. Also, in footnote 8 to the North Haven decision, a distinction is articulated between aggrievement resulting from a failure to give the notice required under a municipal notification statute, and that aggrievement to be proved for an appeal based on the merits of the Board's decision.[17] Here, of course, plaintiffs are appealing the granting of Roncari's application by the Board. The most significant distinction, however, is that in North Haven, no notice was provided under Section 8-3h; here, public notice was given as required by statute and, in fact, plaintiffs responded to that notice, appearing with counsel at the July 10, 1989 public hearing. As defendants point out, these plaintiffs possessed no individualized right to a specific form of notice, as did North Haven under the municipal notification statute; that is, there was nothing peculiar as to these plaintiffs which required the Board to provide notice to them different from the notice required to be given any other property owner. CT Page 752 Accordingly, North Haven is inapposite to the present case.
"The purpose of the statutory public prehearing notice is fairly and sufficiently to apprise the public of the proposed action, so as to enable intelligent preparation for participation in the hearing." R. B. Kent Son, Inc. 21 Conn. App. 370, 378 (1990); Cocivi v. Planning Zoning Commission, 20 Conn. App. 705, 708
(1990). "Although the notice may not be misleading, it need not be exact. . . ." 21 Conn. App. supra at p. 378. Whether the earlier application was withdrawn or denied, or whether the notice contained the fact that Roncari had received approval to build an off-track betting facility is not determinative of the adequacy of the public notice. Rather, the standard of adequacy, as articulated in R. B. Kent and Cocivi, is whether it fairly and sufficiently apprised the public of the proposed action, thereby enabling intelligent preparation. In the court's view, the public notice of the July 10, 1989 public hearing on the Roncari application met that standard. "The primary reason for requiring notice is to advise all affected parties of their opportunity to be heard and to be apprised of the relief sought [;] [a]dequate notice enables parties who have an interest in the subject property to know what is proposed and to have an opportunity to protest [;] [c]onstructive, rather than actual, notice is required go that as much of the populace as possible is constructively notified of the proposed action." Peters v. Environmental Protection Board, 25 Conn. App. 164, 168 (1991).
In Shrobar v. Jensen, 158 Conn. 202 (1968), it was held that ". . . notice of a hearing is not required to contain an accurate forecast of the precise action which will be taken on the subject matter referred to in the notice [;] [i]t is adequate if it fairly and sufficiently apprises those who may be affected of the nature and character of the action proposed, so as to make possible intelligent preparation for participation in hearing, if such action seems desirable." See also: Danseyar v. Zoning Board of Appeals, 164 Conn. 325, 330 91973) (quoting Shrobar). Here the description of the property, and what was being applied for, was accurately represented in the published notice. Anyone reading the notice would have been sufficiently apprised of the character of the proposed action, and been enabled to prepare for the hearing.
The North Haven decision is inapposite to the CT Page 753 present case; the public notice of the July 10, 1989 was legally sufficient.
(5) Uniformity Requirements
Plaintiffs contend they are aggrieved because the Board's decision violated the uniformity requirements of General Statutes 8-2. The statute provides, in pertinent part:
 Such zoning commission may divide the municipality into districts of such number, shape and area as may be best suited to carry out the purposes of this chapter; and, within such districts, it may regulate the erection, construction, reconstruction, alteration or use of buildings or structures and the use of land. All such regulations shall be uniform for each class or kind of buildings, structures or use of land throughout each district, but the regulations in one district may differ from those in another district . . .
Plaintiffs argue that the Board, in approving Roncari's application in 1989, under the pre-"moratorium (September 14, 1985) regulations, abused its discretion by acting in violation of the Section 8-2 uniformity mandate. Plaintiffs maintain that if the 1985 application was withdrawn without prejudice, as opposed to being denied, Roncari's second 1989 application was subject to the moratorium regulations then in effect (regardless of Judge Barall's ruling that the Roncari application be determined under the regulations as they existed on September 4, 1985). It is the court's view that these contentions relate to the merits of this appeal, rather than to the threshold question of aggrievement
In Veseskis v. Bristol Zoning Commission,168 Conn. 358, 360 (1975) the Court stated that "[t]he obvious purpose of the requirement of uniformity in the regulations is to assure property owners that there shall be no improper discrimination, all owners of the same class and in the same district being treated alike with provision for relief in cases of exceptional difficulty or unusual hardship by action of the zoning board of appeals." Plaintiffs argue that the decision was in CT Page 754 contravention of the zoning regulations existing in 1989 and, therefore, provided special treatment to Roncari in violation of General Statutes Section 8-2. This presumes that the application granted by the Board was governed by the 1989 regulations; however, the Superior Court (Judge Barall) instructed the Board that the application was to be decided under the pre-moratorium regulations because the 1985 moratorium was improperly enacted. Issues regarding whether Roncari withdrew its original application, submitted a new one, or had the original denied, do not pertain to aggrievement. To reach the uniformity issue, the court would be required to address the merits of this appeal
Additionally, the cases cited by the plaintiffs do not address the uniformity issue in terms of establishing aggrievement. Plaintiffs themselves phrase this issue as one concerning the merits: "In approving Roncari's application and enforcing it under Town regulations which no longer existed, the ZBA [the Board] abused its discretion by going beyond its scope of authority and violating the uniformity requirement of [Section 8-2]." (Plaintiffs Post-Hearing Memorandum of Law in Response to Motions to Dismiss, dated April 1, 1991, p. 24.). Plaintiffs must first establish aggrievement before the court can consider, on the administrative record, whether there has been an abuse of discretion by the zoning authority.
III. Conclusion
Roncari's Supplemental Motion To Dismiss, dated June 14, 1991, and adopted by defendant Board by pleading dated June 18, 1991, alleging that the plaintiffs named in the amended complaint (10/10/89) are not legally existing entities capable of bringing suit, is Denied.
Plaintiffs' Objection To Roncari Supplemental Motion To Dismiss, dated June 26, 1991, is Sustained.
Plaintiffs' Request For Leave To Amend Complaint, dated June 26, 1991, is Granted.
Defendant's Objection To Plaintiffs' Request For Leave To Amend Complaint, dated July 2, 1991, is Overruled.
Defendants' Motions To Dismiss the appeal, dated October 31, 1989 and November 9, 1989, on the ground that the plaintiffs are not aggrieved persons, are CT Page 755 Granted.
The appeal is hereby dismissed, on the jurisdictional basis that plaintiffs are not aggrieved, without reaching the merits thereof.
MULCAHY, J.